THE ST. LOUIS CARBONATING AND MANUFACTURING COMPANY, Appellant, v. THE ECLIPSE CARBONATING COMPANY, Respondent.

St. Louis Court of Appeals, May 15, 1894.

1. **Trade Mark:** PRIOR USE. It is of the essence of a trade mark that the right thereto should be exclusive. But evidence to prove a prior use of it by others than the claimant of it must be positive and satisfactory.

2. **Unfair Competition in Business:** FRAUDULENT IMITATION OF NAMES USED TO ADVERTISE GOODS. *Held,* in the course of discussion, that a person may give value to a name which is not the subject of a trade mark by identifying it with the sale of his goods, so that he will be protected against the fraudulent imitation of it by a competitor for the purpose of pirating his trade.

*Appeal from the St. Louis City Circuit Court.*—HON. LEROY B. VALLIANT, Judge.

AFFIRMED.

*Geo. W. Taussig* and *Hugh D. McCorkle* for appellant.

*Frank K. Ryan* for respondent.

BOND, J.—This is an application for an injunction against the use of the words "New Orleans Mead" in the labeling, designating, marking and advertising of a certain product of the defendant.

It is alleged in the petition that the president of the plaintiff corporation came to this city in the year 1868, and engaged in the manufacture and sale of mead, under the name of "New Orleans Mead," which title originated with John McCloskey (plaintiff's president), and which had not been known or used prior to that time;

and that it was used as a trade mark in 1868, and by successive business firms, from whom the title thereto was acquired, until 1888, at which time plaintiff became incorporated and acquired the full ownership of said trade mark; that, since the organization of plaintiff as a corporation, it has engaged extensively in the sale and advertisement of "New Orleans Mead," and enjoys a lucrative trade in said product; that at and since the first adoption of this name it was employed, and that it still is employed, as a fancy and arbitrary term of proper use for a trade mark, and that it did not and does not, by the use of the words "New Orleans" indicate the place of manufacture or the quality of the product; that one Henry J. B. Rose, a former officer and stockholder in plaintiff's corporation, sold his holding therein, and afterwards organized with one Judge the defendant corporation under the name of Eclipse Carbonating Company, of which the said Rose is the general manager, with full knowledge of plaintiff's rights to the trade mark in question; that the defendant, contriving to injure plaintiff, is now preparing, manufacturing and selling, in the city of St. Louis an inferior quality of mead under the name of the "Eclipse Carbonating Company's New Orleans Mead," and has so labeled the goods sold by it to its retail customers; and that this conduct on the part of defendant imposes upon and deceives the public and injures plaintiff's property in said trade mark; that the act and doing of defendant in this respect is for the fraudulent purpose of wrongfully taking from plaintiff the trade built up by its superior quality of mead as aforesaid; and that plaintiff has notified the defendant to desist from such wrongful acts, but that defendant willfully and wrongfully refuses so to do. Wherefore it is alleged that plaintiff is damaged in the sum of $10,000, and an injunction is prayed and an accounting of the profits made by

defendant on sales under plaintiff's trade mark or trade name.

The answer of defendant sets up that the words "New Orleans Mead" constituted the true and common name of a kind of mead that originated and came into use in the city of New Orleans, Louisiana, where said kind of mead was manufactured and sold long prior to the year 1868, and that said mead has ever since been prepared and sold by different parties in no way connected in business, who never at any time claimed the words "New Orleans" as a trade mark or part of a trade mark for their mead; but that during the time, aforesaid such words have been, and that they are now, in general use by manufacturers of mead in the city of New Orleans, who have no exclusive property right therein, in designating the products of their different establishments; that, after the introduction and use of this kind of mead in said city of New Orleans, its manufacture and sale has been extended throughout the United States, and thereby the words "New Orleans Mead" have ceased to have significance or application to the city of New Orleans, but have become a generic name used to indicate a class of meads, including those made by the plaintiff, defendant and other persons in different parts of the country, and are so used because such mead originated in said city of New Orleans.

The answer further sets up that among the manufacturers of mead in New Orleans was one Hugh McCloskey, whose business has been continuously carried on there since 1868, and whose mead was designated as "McCloskey's New Orleans Mead," and as such was well and favorably known to the people of New Orleans. It then admits that John McCloskey, president of the plaintiff, acquired the formula for preparing the mead sold by plaintiff from Hugh McCloskey, by whom the said John McCloskey was employed in

New Orleans previous to 1868, and that shortly after this time John McCloskey removed to St. Louis, and manufactured mead which was advertised as "New Orleans Mead." But it avers that the said John McCloskey and his successors in business, including the plaintiff, at all times until the defendant engaged in the manufacture of mead, represented that their mead was the genuine New Orleans mead, and endeavored to identify their said mead with that of said Hugh McCloskey.

The answer then avers that any knowledge that John McCloskey may have acquired of said Hugh McCloskey's method of making mead was without the knowledge or consent of said Hugh McCloskey, and without any right, except so far as the words designated *the quality* of such mead. It further avers that, after the defendant corporation was organized, it engaged in the manufacture of New Orleans mead without any reference to the plaintiff or any article of mead by it manufactured; and that defendant's New Orleans mead has been placed upon the market with brands and marks clearly distinguishing it from that manufactured by plaintiff.

The evidence shows that John McCloskey, president of the plaintiff, came to America in 1866, landing at New Orleans, where he remained about two years, and that he was employed while there by Hugh McCloskey, who was then engaged in that city in the manufacture of mead; that, in 1868, said John McCloskey located in St. Louis and engaged in the manufacture of meads, soda water and syrups, under the trade mark and name of "New Orleans Mead;" that in 1872, said McCloskey and one Cull, who was then in copartnership with him, in their firm name of McClosey & Cull, registered the words "New Orleans Mead" as a trade mark; that these words were printed

on their wagons and on boards and cards, and advertised in the newspapers as the name of the mead sold by them; that the business so begun by John McCloskey, after passing through different firms composed of himself and other partners, was acquired by the plaintiff, and was being conducted by the plaintiff at the time of the institution of this suit, with full use of the words "New Orleans Mead" in advertising, selling, placarding and marking, the mead manufactured by it.

The evidence also showed that, before plaintiff located in St. Louis, an article of mead was manufactured in New Orleans by a man named Nichols, which had gained favor among the steamboat men, and was called by them "New Orleans Mead;" that this manufacturer was the predecessor in business in New Orleans of Hugh McCloskey, by whom plaintiff was employed in 1866 and 1867, and from whom plaintiff acquired the formula which he subsequently used after his location in St. Louis in 1868, with some slight change, in making the product thereafter sold by plaintiff in St. Louis as "New Orleans Mead."

The evidence also disclosed that cards and other advertisements of "New Orleans Mead" were seen in Cincinnati, Louisville and Evanville, as early as 1864 and 1865.

There was also evidence that the mead manufactured by Gellitch from 1858 to 1864 in St. Louis was sold to two saloon keepers, one of whom stated that it was his impression that the article was designated, "New Orleans Mead," the other of whom said that it was not clear whether it was called "Mead," or "New Orleans Mead," but stated that, when he asked for it, he merely called for a glass of mead. Both of these witnesses stated that there were no signs, advertisements or placards of "New Orleans Mead," where

Mr. Gellitch made it, or in the saloons of the two witnesses.

There was also evidence (Jones, druggist) that the article called "New Orleans Mead" had been known in this city for forty years, and that after the dissolution of the copartnership with plaintiff and Mr. Cull, the latter formed a copartnership with one Bergtold, and this firm sold "New Orleans Mead."

There was also evidence tending to show that plaintiff did not know of these sales made by Bergtold and Cull, and there was other testimony that the name of New Orleans Mead had not been heard in connection with mead prior to the time it was sold by plaintiff during his copartnership with Cull.

The circuit judge, sitting as a chancellor, rendered a judgment dismissing plaintiff's petition, on the ground that it appeared from the evidence "that, prior to the time when plaintiff's assignor adopted the name of "New Orleans Mead," an article of a similar nature was known by that name in this community, and that it had a favorable reputation as a beverage." From this judgment plaintiff has prosecuted his appeal to this court.

The question arising for decision is whether or not there was such a prior use of the terms "New Orleans Mead" at the time of their adoption as a trade mark by plaintiff's assignors, as to render them *publici juris* and therefore not subject to appropriation as a trade mark.

In considering this question we shall concede that the fact, that New Orleans is the name of a place, is not an objection to its adoption as a trade mark or trade label, when it is not employed in a geographical sense, but is only used as a term of fancy to designate the origin or ownership of an article. *Liggett & Meyers*

*Tobacco Co. v. Sam Reid Tobacco Co.*, 104 Mo. 53; *Sanders v. Utt*, 16 Mo. App. 322.

It is also true that the evidence adduced to prove prior use should not be conjectural nor indefinite, but positive and satisfactory to the trier of the fact. Still, we are unable to see any escape from the conclusion, that, at and before the adoption of the trade mark by plaintiff's assignors, the words "New Orleans Mead" were well known in this city and elsewhere as descriptive of a drink of high relish sold under that name.

Positive and direct testimony to this effect was given by witnesses Ford, Jones, Miltenberger, Quehue and others, and the only evidence to the contrary was *negative* testimony of certain witnesses who did not know of the prior use of the terms in question. This testimony did not contradict, but might indeed consist with positive evidence of prior use.

It is of the essence of a trade mark, that the right thereto should be exclusive. As the facts in this record show that plaintiff's assignors had no exclusive right to adopt the words "New Orleans Mead" at the time he selected them as a trade mark, he acquired no rights by their subsequent use which the law will protect *on that ground*.

It is urged by appellant that there is another ground upon which it is entitled to an injunction, *i. e.*, unlawful competition.

It is no doubt the law that a party may give a value to a name, which is not the subject of a trade mark, by identifying it with the sale of his goods, so that he will be protected against the fraudulent use thereof as a means of pirating his trade by another.

The books abound in cases of relief granted by courts of equity for the improper use of labels, wrappers, bill heads, signs and other things that are essentially *publici juris*, on the ground that thereby the goods of

one person have been intentionally and fraudulently sold as the goods of another, to the damage of the latter. While courts of equity will enjoin an infringement of a technical trade mark which has been occasioned by accident or misunderstanding, and without actual fraud on the part of the infringer, it will not enjoin imitations of the labels, bill heads, or commercial names of a rival trader, unless such imitations are fraudulently designed and tend to occasion damage. *American Brewing Co. v. St. Louis Brewing Co.*, 47 Mo. App. 14; *Plant Seed Co. v. Michel Plant & Seed Co.*, 23 Mo. App. 579; Browne on Trade Marks, sections 43, 91, 521, 533; *McLean v. Fleming*, 96 U. S. 245. The grant of relief in such cases is rested upon the right of a trader to be protected from dishonest competition.

It was, therefore, held by the supreme court of the United States, upon a bill for injunction against unlawful and unfair competition in business, ''that, irrespective of the technical question of trade mark, the defendants have no right to dress their goods up in such a manner as to deceive an intending purchaser, and induce him to believe he is buying those of the plaintiffs. Rival manufacturers may lawfully compete for the patronage of the public in the quality and price of their goods, in the beauty and tastefulness of their inclosing packages, in the extent of their advertising, and in the employment of agents, but they have no right by imitative devices to beguile the public into buying their wares under the impression they are buying these of their rivals.'' *Coats v. Merrick Thread Co.*, 149 U. S. 562.

The petiton in the case at bar, however, was not intended, nor are its allegations broad enough, to embrace a cause of action for unlawful competition. It was framed solely to protect an assumed trade mark, which as has been seen does not exist, in the terms

"New Orleans Mead." It necessarily results that the trial court was right in holding that upon the pleadings and evidence the plaintiff was not entitled to equitable relief, and that its decree dismissing the bill must be affirmed. All concur.